**UNITED STATES of America, Plaintiff,**

v.

**55.0 ACRES OF LAND, MORE OR LESS, SITUATE IN OREGON COUNTY, MISSOURI; and Coy L. Adams, et al., Defendants.**

**No. 77–3538–CV–S–1.**

United States District Court, W. D. Missouri, S. D.

March 6, 1981.

Robert G. Ulrich, U. S. Atty., Linda L. Parker, Asst. U. S. Atty., Kansas City, Mo., for plaintiff.

Harold L. Henry, West Plains, Mo., Thomas H. Stahl, Guardian Ad Litem, Gladstone, Mo., for defendants.

## ORDER

JOHN W. OLIVER, Senior District Judge.

### I.

This action is brought pursuant to the Wild and Scenic Rivers Act of October 2, 1968 (82 Stat. 906; 16 U.S.C. §§ 1271–1287), as amended (88 Stat. 122), which authorizes the acquisition of scenic easements to promote the preservation and protection of the immediate environment, water quality, free flowing conditions, and other natural qualities of the Eleven Point River, among others. The Act defines "scenic easement" as:

... [T]he right to control the use of land (including the air space above such land) within the authorized boundaries of a component of the wild and scenic rivers system, for the purpose of protecting the natural qualities of a designated wild, scenic or recreational river area, but *such control shall not affect, without the owner's consent, any regular use exercised prior to the acquisition of the easement.* [Emphasis added]

The question presented in this case is what were the "regular uses" of the subject tract prior to the taking. Plaintiff and defendant were able to stipulate many of the prior uses of the land. However, four uses asserted by the defendant landowner are objected to by plaintiff. They are: (1) commercial canoe rental service and business access for commercial canoe rental service; (2) commercial camping; (3) extraction of gravel from the Eleven Point River; and (4) the right to reconstruct a clubhouse with trailer parking area.

On July 3, 1980 we referred this action to the United States Magistrate, pursuant to Rule 71A(h) and Rule 53, F.R.C.P., and 28 U.S.C. § 636, for a hearing on the issue of the four disputed prior regular uses of the subject tract.

The Magistrate submitted his proposed findings of fact and recommendation on October 16, 1980. Both parties have filed objections to certain of the Magistrate's findings. Pursuant to 28 U.S.C. § 636(c) we shall make a *de novo* determination of those portions of the report and findings to which objections have been made.

### II.

Plaintiff contends that the evidence fails to support the Magistrate's conclusion that commercial camping, including the right to park private and commercial vehicles as part of the commercial camping enterprise, was a regular use exercised prior to the acquisition of the easement within the meaning of 16 U.S.C. §§ 1271–1287. Defendants object to the finding of the Magistrate that a canoe rental service, a clubhouse, and gravel extraction were not regular uses prior to the taking of the easement.

The Court has found no published cases which consider the meaning of the term

"regular use" as employed in the Act. Plaintiff's counsel has helpfully directed attention to *United States of America v. Scott,* Civil No. 76–352–101–7, an unpublished opinion filed August 29, 1978 in the United States District Court for the District of Oregon. The Court in *Scott* held that a "regular use" was one "steady or uniform in course, practice, or occurrence."

■ We agree with Judge Burns' stated view in *Scott* that in the absence of any legislative history indicating the intent of Congress in utilizing that term, the term "regular use" must be given its ordinary meaning and must be construed to accord with the Act's intended purpose which is to restore and preserve the natural state of the rivers. 16 U.S.C. § 1271 (1968).[1]

The landowner must prove a use steady or uniform in course, practice, or occurrence at or near the time of taking.

### III.

■ After a *de novo* review of the files and records and all evidence adduced, we adopt the findings of the Magistrate that the canoe rental service, the club house, and the extraction of gravel were not regular uses prior to the taking.

None of the witnesses testified as to any regular use of the property for canoe rental

during the 70's or even the 60's. The testimony regarding the club house at best establishes a commercial use only in the 1940's and 1950's. It is undisputed that the club house was destroyed sometime in the very early 1970's or prior thereto. Obviously, no use was made of it after that time, and no testimony was produced of any attempt by the owners to rebuild it. Even when in existence, there was no specific testimony that anyone used the club house on a regular basis as part of either a canoe rental or a camping business.

With regard to the extraction of gravel, private use was intermittent at best, and involved only limited extraction by Mr. James Adams and Mr. Clifford Adams. Commercial use apparently was regular only in the 1940's or 1950's in connection with the construction of Highway 142. Defendants' objections to these findings are overruled.

### IV.

■ We reach a different conclusion with respect to the Magistrate's recommended finding and conclusion in regard to a regular commercial camping use. In its objections plaintiff contends that the commercial camping use made of the subject tract was limited in time and volume and that the

---

1. It is sometimes difficult to establish the specific purpose and goals of various legislative efforts to preserve our scenic wilderness areas both in and out of the national park system. Insightful reflections on the competing interests which have and are playing a part in the development of our national park system are found in Joseph Sax's well written study, *Mountains Without Handrails.* As Mr. Sax notes at page 46 of his book:

> While nature is not a uniquely suitable setting, it seems to have a peculiar power to stimulate us to reflectiveness by its awesomeness and grandeur, its complexity, the unfamiliarity of untrammeled ecosystems to urban residents, and the absence of distractions. The special additional claim for nature as a setting is that it not only promotes self-understanding, but also an understanding of the world in which we live. Our initial response to nature is often awe and wonderment; trees that have survived for millenia; a profusion of flowers in the seeming sterility of the desert; predator and prey

living in equilibrium. These marvels are intriguing, but their appeal is not merely aesthetic. Nature is also a successful model of many things that human communities seek: continuity, stability and sustenance, adaptation, sustained productivity, diversity, and evolutionary change.

Professor Sax notes that a failure to appreciate that the parks are more than simply undestroyed scenery has led historically to many controversies over their uses. In the case of the Wild and Scenic River Act it must be recognized that any intrusive use permitted impairs the opportunity to experience the natural scene which Congress apparently intended to preserve. Congress, however, set forth a careful balance in the Act designed to preserve nature to "stimulate the appetite," but also recognized the perhaps conflicting rights of landowners on whose property a scenic easement is imposed. This balance should be carefully preserved by the courts in construing the statute and determining the permitted regular uses in the areas on which scenic easements are imposed.

parking of vehicles associated with the use was not established. We agree.

For the reasons stated below, we conclude that the Special Master's finding that "commercial camping, which shall include the right of parking of either private or commercial vehicles as part of the commercial camping operation" was a regular prior use is not established by the evidence and must be modified.

A limited use for camping for which the camper may have been required to pay was established solely in connection with the canoe rental business conducted at one time by Don Woods. Woods testified that some of his canoe rental customers camped on the Adams' frontage land. Further, he testified that he paid a yearly fee to Adams for this camping privilege, though he acknowledged that the canoe season was only six months in length. The camping use made by customers of Woods is the sole *commercial* camping use established by the record.[2] Plaintiff's objections to the unlimited finding of a commercial camping use must, therefore, be sustained.

We find and conclude that the evidence adduced only supports a finding that the maximum commercial camping use that may be recognized must be limited to the landowner's right to charge persons using a portion of the easement area for camping purposes incident to a float trip on the river, to the extent that camping occurs either before or after a canoe or boat is put in or taken out of the river.

2. We recognize that a substantial number of witnesses testified in regard to the existence and extent of camping which they observed prior to and at the time of the taking in 1977. The following summary of the testimony of those witnesses establishes that the evidence adduced is not sufficient to support a finding of a regular *commercial* camping use prior to and at the time of the taking in 1977:

James Adams, Clifford Adams, and Claude Adams, all sons of the previous landowner, Coy Adams, who died in 1977 just prior to the taking, testified that their father had at one time operated a commercial camping business. Each had assisted during the 1940's or 1950's. But none of the sons had any knowledge of what financial arrangements their father made in running the business after 1960, and little knowledge of the financial side of the business prior to 1960 (Tr. 17, 34, 35). James Edwards, a former teacher and school superintendent, stated that he and Adams exchanged favors but that he was not regularly charged for camping (Tr. 49). Gene Johnson, another retired teacher, testified that although his church group camped there once about 1976 (Tr. 63), it was not charged for the privilege (Tr. 65). Although Don Ross, a realtor-farmer, testified that he personally observed people camping there in the warm weather almost every week through 1976 (Tr. 67, 68, 69), he *did not* testify that such camping was commercial. In like manner, Lee Dethrow, an associate judge, testified that Coy Adams had a commercial operation "some years back" involving camping and boat rentals (Tr. 73), but that he knew nothing about the business (Tr. 73).

Wilkerson, an acquaintance of Coy Adams, was unsure of any business operations occurring in the 1970's though he saw people camping and boating there (Tr. 78, 80, 81).

Melton Roberts, a retired deputy sheriff on river patrol, testified that he observed boats there when he saw people camping there, but had no knowledge with respect to whether the campers were charged. He saw boats and people camped there quite frequently, i. e., on perhaps 30% to 40% of his trips (Tr. 83). Both John Price and Bob Gardner of the United States Forest Service floated the Eleven Point River frequently and both observed people camping on the Adams' river frontage but neither had any knowledge of Coy Adams' business (Price Tr. 95, 96; Gardner Tr. 98, 100–102, 115).

The testimony of all of the above witnesses, taken together, simply fails to establish any *commercial* camping use, at least after 1960. Rather, it *would indicate that Coy Adams let friends and acquaintances camp on the property out of friendship or in exchange for favors. That people used the locale for camping is clear, but there is simply nothing in the above testimony to establish a regular camping use for which people were charged.*

*Only one witness testified with knowledge of a commercial use after the 1960's.* Don Woods, a canoe rental operator, testified that since 1968 and to date he has used the Adams' frontage for access for about 30% of his canoe rental business. Though no formal arrangements existed, Woods stated he paid Adams $100.00 to $200.00 per year for this privilege. Woods estimated that about 20% of the people using the Adams' access point camped on the property. The charge for camping was included in the canoe rental charge.

We conclude, however, that the most that Woods' testimony could be said to establish was a quite limited commercial use of the property under which an indirect fee for camping was charged in connection with canoe rentals by Woods' float trip customers.

**324**

In short, the incidence of use for camping for which a charge may be made shall not exceed the volume of camping which was incident to the business operation of Don Woods during the year (1977) immediately prior to the acquisition of the easement. Any broader finding is not supported by the evidence.

It is therefore

ORDERED (1) that defendant's objections to the report of the Special Master should be and hereby are overruled. It is further

ORDERED (2) that plaintiff's objections to the report of the Special Master should be and hereby are sustained in part. The proposed finding of the Special Master with respect to commercial camping is modified to provide that the camping use for which a charge may be made is established as a regular use only to the extent it existed in 1977 as an adjunct to the canoe rental business of Don Woods. The recognized use shall include the right to place and use camping tents within the easement area limited, however, to the cleared frontage in the immediate vicinity of the picnic table as located and identified in plaintiff's exhibit 8. The recognized use shall not include any right to locate or park motorized camping vehicles or trailers of any type within the designated easement area. It is further

ORDERED (3) that the following uses (as stipulated by the parties) were prior regular uses of the subject tracts:

(1) timber harvesting;

(2) one private non-commercial water craft launching site for use by defendants, defendants' family, and defendants' invitees;

(3) livestock grazing and watering, livestock salting and oiling but not within 100 feet of the Eleven Point River or any spring or spring branch leading to the river, and fenced holding area for livestock as presently exists;

(4) private access from Highway 160 to and along river for one-half mile;

(5) general agricultural operations including fencing or previously fenced areas and hay, row and grain crop cultivation and production;

(6) gardening for defendants' personal use;

(7) maintenance, repair and control of existing roads and paths for use by defendants, defendants' family, and defendants' invitees;

(8) non-commercial recreational use by defendants, defendants' family, and defendants' invitees, including hunting, trapping, and fishing to the extent allowed by the laws of the State of Missouri, target and trap shooting to the extent that such activity is not in conflict with any federal law or regulation, camping, swimming, hiking, climbing, baptizing, and equestrian and vehicle use;

(9) control of land to the water's edge, the term "water" meaning the Eleven Point River subject to the rights acquired by plaintiff under this easement.